# EXHIBIT 1

**STATE OF MICHIGAN**
**MICHIGAN OFFICE OF ADMINISTRATIVE HEARINGS AND RULES**

| | |
|---|---|
| **IN THE MATTER OF:** | **Docket No.: 21-007624** |
| **S.C. o/b/o T.M.,** | **Case No.:   DP-21-0007** |
| **Petitioner** | |
| **v** | **Agency:      Education** |
| **Detroit Public Schools Community District,** | **Case Type:  ED Sp Ed Regular** |
| **Respondent** | **Filing Type: Appeal** |

_____/

**Issued and entered**
**this 13th day of January 2023**
**by: Paul Smith**
**Administrative Law Judge**

**<u>DECISION AND ORDER</u>**

**<u>PROCEDURAL HISTORY</u>**

This matter concerns a due process hearing complaint under the Individuals with Disabilities Education Act (IDEA) 20 USC 1400 *et seq*. Petitioner S.C. filed a request for a due process hearing on April 13, 2021, on behalf of her daughter, T.M.,[1] against Respondent Detroit Public Schools Community District. Respondent filed a response on April 27, 2021. This is the second due process claim filed by Petitioner against Respondent, the first dispute having been settled through mediation on July 3, 2019.

A prehearing conference was held on April 29, 2021, at which time the parties advised this Tribunal that the matter would go to mediation again. The parties asked to have a hearing set for August 2021. In the April 30, 2021, order following the prehearing conference, this Tribunal dismissed Counts II, III, and IV of the Due Process Complaint for lack of jurisdiction. The order additionally clarified the parties' shared understanding that Petitioner's claim for relief in the present matter was limited to events occurring "after resolving an earlier dispute through mediation on July 3, 2019."

On April 27, 2021, Petitioner filed a motion to compel Respondent to file an answer specifically addressing the issues raised in her complaint. Respondent filed a brief opposing this motion on May 7, 2021. On May 25, 2021, this Tribunal issued an order denying Petitioner's motion to compel a more specific answer.

---

[1] To protect her identity, T.M. will be referred to only as "Student."

21-007624
Page 2

On June 18, 2021, Respondent filed a motion for summary disposition. Petitioner filed a response on July 2, 2021, and Respondent filed a reply brief on July 12, 2021. On July 30, 2021, this Tribunal issued an order granting Respondent's motion for summary disposition in part. This Tribunal's July 30, 2021, order dismissed (1) all allegations based on facts occurring before July 3, 2019, and (2) all allegations based on Respondent's alleged failure to comply with the parties' July 3, 2019, mediation agreement.

On July 28, 2021, Petitioner filed a motion to adjourn the due process hearing, to which Respondent did not object. A status conference was held on July 30, 2021, at which Petitioner asked to have more time to schedule an independent educational evaluation (IEE) to occur before the hearing. Another status conference was held on August 12, 2021, to update the Tribunal on Petitioner's progress in scheduling the IEE. The parties then requested to move the hearing to October 2021.

The IEE was completed on September 1, 2021. On September 20, 2021, Petitioner filed a motion to compel payment for the IEE. On October 5, 2021, this Tribunal issued an order compelling Respondent to pay for the IEE.

Just before the October 2021 hearing dates, the parties stipulated to adjourn because Respondent's attorney was having medical issues. At the parties' request, the hearing dates were moved to the end of January 2022. Then, approximately two weeks before the scheduled hearing date, counsel for Respondent passed away. Respondent asked to postpone the hearing again and Petitioner did not object. A prehearing conference was held on January 21, 2022, at which the parties requested to move the hearing to April 2022.

The hearing was conducted on April 7, 2022, April 8, 2022, April 14, 2022, and April 28, 2022. Attorneys Elizabeth Abdnour and Jacquelyn Babinski represented Petitioner. Attorney Erin Walz represented Respondent. The undersigned ALJ presided. Nine witnesses testified. Petitioner's exhibits 1-4, 6-15, and 17-26 were admitted into evidence without objection.[2] Respondent's exhibits A-BB were admitted into evidence without objection.

After the hearing was concluded, the parties agreed to a briefing schedule. On June 9, 2022, this Tribunal issued an order granting the parties' request to extend the briefing schedule. The final brief was submitted on August 8, 2022, after which the record was closed.

---

[2] Petitioner's Exhibit 5 was excluded before the hearing pursuant to an order dated January 20, 2022, granting Respondent's motion in limine. Petitioner's Exhibit 16 was not offered into evidence.

21-007624
Page 3

## ISSUES AND APPLICABLE LAW

A. Issues Before the Tribunal

As set forth in the April 30, 2021, Order Following Prehearing Conference, the issues are as follows:

> After resolving an earlier dispute through mediation on July 3, 2019, did Respondent deny T.M. a free and appropriate public education ("FAPE") by any of the following alleged omissions?
>
> - Failing to comprehensively evaluate T.M. to determine her educational needs;
>
> - Failing to revise T.M.'s Individualized Education Program ("IEP") to address her alleged inability to access an educational benefit and make appropriate progress;
>
> - Failing to draft an IEP reasonably calculated to meet T.M.'s educational needs and allow her to access an educational benefit and make appropriate progress; and
>
> - Failing to implement T.M.'s IEP as written.

B. Free and Appropriate Public Education

The Code of Federal Regulations, 34 CFR § 300.39(a)(1)(i) and (ii), defines "special education" as follows:

> Special education means specially designed instruction, at no cost to the parents, to meet the unique needs of a child with a disability, including— (i) Instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and (ii) Instruction in physical education.

The Federal Regulations, 34 CFR § 300.39(b)(3), define "specially designed instruction" as follows:

> Specially designed instruction means adapting, as appropriate to the needs of an eligible child under this part, the content, methodology, or delivery of instruction—
>
> (i)     To address the unique needs of the child that result from the child's disability; and

21-007624
**Page 4**

(ii)     To ensure access of the child to the general curriculum, so that the child can meet the educational standards within the jurisdiction of the public agency that apply to all children. 34 CFR 300.39(b)(3).

Students protected by the provisions of IDEA are entitled to be appropriately identified, evaluated, placed, and provided a FAPE that includes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living. 20 USC 1400(d); 34 CFR 300.1.

Under 20 USC 1415(f)(3)(E), it may be found that a FAPE has been denied to a disabled student based on either substantive or procedural violations of the IDEA. To find a denial of a FAPE based on procedural violations of the IDEA, it must also be found that the procedural violation impeded the student's right to a FAPE, significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to their child or caused a deprivation of educational benefits.

In *Board of Education of Hendrick Hudson Central School District v Rowley,* 458 US 176; 102 S Ct 3034; 73 L Ed 2d 690 (1982), the United States Supreme Court articulated the two bases for assessing the provision of a FAPE. The first was whether the school district had complied with the procedural requirements of the IDEA, and the second was whether the student's IEP was "reasonably calculated" to enable the student to receive educational benefits. *Id*. at 206-07.

In assessing whether a student's IEP was reasonably calculated to enable the student to receive educational benefits under *Rowley*'s second basis above, the Sixth Circuit Court of Appeals held that the IDEA requires an IEP to confer a "meaningful educational benefit gauged in relation to the potential of the child at issue." *Deal v Hamilton County Bd of Ed*, 392 F3d 840, 862 (CA 6, 2004). Nevertheless, the IDEA requirement that school districts provide disabled children with a free appropriate public education does not require that a school either maximize a student's potential or provide the best possible education at public expense. *Doe v Tullahoma City Schools,* 9 F3d 455 (CA 6, 1993); *Fort Zumwalt Sch Dist v Clynes,* 119 F3d 607, 612 (CA 8, 1997), *cert den,* 523 US 1137 (1998). The United States Supreme Court, in *Endrew F. v. Douglas County Sch. Dist. RE-1*, 580 US 386; 137 S Ct 988 (2017), expanded its explanation of FAPE concerning *Rowley's* second prong, stating that for a school district "[t]o meet its substantive obligation under IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id*. at 999.

**21-007624**
**Page 5**

Finally, the primary responsibility for formulating the education to be accorded a disabled child, and for choosing the educational method most suitable to the child's needs, was left by IDEA to state and local educational agencies in cooperation with the parents or guardians of the child. Reviewing courts may not substitute their own notions of sound educational policy for those of the school authorities which they review. *McLaughlin v. Holt Pub Schs*, 320 F3d 663 (CA 6, 2003).

    C.  <u>Reevaluation Requirement</u>

The relevant rules governing reevaluation are set forth in 34 CFR § 300.303:

    (a)  General. A public agency must ensure that a reevaluation of each child with a disability is conducted in accordance with §§ 300.304 through 300.311—

        (1)  If the public agency determines that the educational or related services needs, including improved academic achievement and functional performance, of the child warrant a reevaluation; or

        (2)  If the child's parent or teacher requests a reevaluation.

    (b)  Limitation. A reevaluation conducted under paragraph (a) of this section—

        (1)  May occur not more than once a year, unless the parent and the public agency agree otherwise; and

        (2)  Must occur at least once every 3 years, unless the parent and the public agency agree that a reevaluation is unnecessary.

[34 CFR § 300.303]

    D.  <u>Review and Revision of IEP</u>

The relevant rules governing revision of an IEP are set forth in 34 CFR § 300.324(b):

    (b) Review and revision of IEPs—

        (1)  General. Each public agency must ensure that, subject to paragraphs (b) (2) and (b)(3) of this section, the IEP Team—

            (i)  Reviews the child's IEP periodically, but not less than annually, to determine whether the annual goals for the child are being achieved; and

21-007624
Page 6

        (ii)  Revises the IEP, as appropriate, to address—

            (A)  Any lack of expected progress toward the annual goals described in § 300.320(a)(2), and in the general education curriculum, if appropriate;

            (B)  The results of any reevaluation conducted under § 300.303;

            (C)  Information about the child provided to, or by, the parents, as described under § 300.305(a)(2);

            (D)  The child's anticipated needs; or

            (E)  Other matters.

      (2)  Consideration of special factors. In conducting a review of the child's IEP, the IEP Team must consider the special factors described in paragraph (a) (2) of this section.

      (3)  Requirement with respect to regular education teacher. A regular education teacher of the child, as a member of the IEP Team, must, consistent with paragraph (a)(3) of this section, participate in the review and revision of the IEP of the child.

[34 CFR § 300.324(b)]

## SUMMARY OF WITNESS TESTIMONY

Nine witnesses testified at the due process hearing. Their testimony is summarized as follows:

**Petitioner S.C. (Tr., pp 34-178):** Student's mother testified about the special education services Student had received over her life. Student was diagnosed with Sickle Cell Anemia at birth. Her condition causes her to be hospitalized three to four times per year for seven to ten days at a time. When she is in the hospital, she attends school online to the extent possible.

In general, Petitioner believed that Respondent should have provided more resources to help Student learn. Petitioner was actively involved trying to ensure that the school was doing all that it was supposed to be doing to support Student. She did not see Student making any progress and did not believe that Student achieved the goals that were set out for her in the IEPs. She objected to the school's requirement that Student could not have more than four separate goals per IEP and that it would not include a writing goal.

21-007624
Page 7

Petitioner also testified that, despite repeated requests, the school did not provide her with the kind of information or data that would allow her to understand Student's academic progress or success accomplishing her goals. Petitioner believed that Student was making progress in the areas of cosmetology and social work, but not in math, reading, or writing.

Petitioner also had concerns about the transportation to school that was supposed to be provided pursuant to Student's IEP. They did not reliably pick up Student and they would require Student to walk to the corner of her street to get on the bus, which could aggravate Student's medical condition in extreme heat or extreme cold conditions. These issues frequently caused Student to arrive late for school in the morning.

In sum, Petitioner described her overall impression of her experience with the school as being like "a nightmare, a horror movie." Dealing with the school was draining and made Petitioner feel helpless. She believes Student did not receive a free and appropriate education because the goals in her IEP were not specific and individualized to Student's needs.

**Student (Tr, pp 204-219):** Student testified that she enjoys doing hair and nails and that she wants to study cosmetology. Someday she would like to own her own salon. She has been braiding hair since she was six years old, learning new styles from watching YouTube videos. Student also started her own lip gloss business, but she gave it up when the liquid matte lipstick product she was making (based on a YouTube video) did not work out as well as hoped. Student is now learning how to use a new sewing machine that her mother bought for her. She explained that she likes cosmetology because it is artistic and because she is a hands-on learner. Student testified that she would graduate in 2022 and that she plans to attend a two-year community college for business and to continue pursuing cosmetology.

Student also testified that school has been difficult because she has missed so much time due to her illness, and that there is only so much she can do from the hospital. Student also explained that sometimes she learns at a slower pace than the material is being taught. She testified that she likes her two resource teachers and that they help her "as much as they can."

**Tammora Green (Tr., pp 180-202, 221-246, 299-330):** Ms. Green is Respondent's Supervisor of Compliance, responsible for everything related to the provision of special education services in the district, including providing support and training to staff that are directly servicing students. She has exchanged emails with Petitioner relating to the parties' 2019 mediation agreement and has attended some of Student's IEP meetings. Ms. Green provided general testimony about the IEP process in the district and about the roles of various positions within the administration of special education services.

21-007624
Page 8

She attended the IEP and Review of Existing Evaluation Data (REED) meetings as an observer, but not as part of the team that developed the IEPs.

Ms. Green testified about an October 2020 meeting between IEP team members and Petitioner that was intended to address concerns Petitioner had expressed about parent/school communication. As a result of this meeting, a REED meeting was held on October 30, 2020, at which time it was decided to schedule an academic evaluation of Student. Ms. Green testified that she asked Petitioner if she wanted a full psychoeducational evaluation for Student and Petitioner responded that she had no cognition concerns but that she wanted to have an up-to-date assessment of Student's academic standing in math, reading, and writing. Finally, Ms. Green also testified about "IEP data" that she sent to Petitioner upon request.

**Marlene Hunter-Armstrong (Tr., pp 333-344):** Ms. Hunter-Armstrong is Respondent's Compliance Director for Special Education, responsible for ensuring that Respondent complies with the requirements of the IDEA. She testified about the responsibilities of various positions on the organizational chart for Respondent's Exceptional Student Education Department.

**Gretchen Madison (Tr., pp 355-381, 390-447):** Ms. Madison is a special education teacher at Student's school. Student was one of the special education students assigned to Ms. Madison, starting the 2020-2021 School Year, which was entirely virtual due to the COVID-19 pandemic. To do her job, Ms. Madison both "pushed in" to Student's math and ELA classes (to help with anything Student felt she did not understand) and "pulled out" Student from class to work with her separately and provide extra services. Ms. Madison testified about the work she did with Student and the progress reports she wrote for Student.

**Genise Turner (Tr., pp 481-496):** Ms. Turner is a resource provider employed by Respondent. She administered a Brigance Compensatory Inventory test to Student, as referenced in the February 2020 IEP. This test is given to all special education students every year. Student scored seventh grade level in reading, second grade level for math calculations, and eighth grade level for word recognition. Ms. Turner worked with Student for an hour each day, either observing her in Student's classroom or pulling her into a smaller classroom.

**Darya Owens (Tr., pp 17-33):** Ms. Owens was a tutor who worked with Student for 20 hours per week, after school, from December 2020 through June 2021. She testified that, in her view, Student's reading and math skills were at about a fifth-grade level, below what was stated in her IEP. According to Ms. Owens, Student's skills did not improve over the time Ms. Owens worked with her.

21-007624
Page 9

**Steven Portnoy (Tr., pp 449-479):** Mr. Portnoy is a school psychologist employed by Respondent. In that capacity, he administers evaluation tests to students. He administered Student's academic achievement testing requested in Student's REED. Mr. Portnoy used the Woodcock-Johnson IV test to evaluate Student's in the following areas: basic reading skills (average), reading comprehension (average), reading fluency (low average), math calculation skills (impaired), math reasoning (borderline), and written expression (low average). (Exhibit 21).

Mr. Portnoy did not suggest doing any additional cognitive testing, which is usually done to determine if a student may be eligible for some other type of disability. It was not requested of him for Student because nobody in the REED meeting suspected anything else other than Other Health Impairment (OHI) as Student's primary disability. He surmised that cognitive testing of Student possibly would have given him some more information to look at to determine whether Student had a learning disability (depending on what her cognitive testing scores were). With respect to the question why Student's scores varied so much from subject to subject, he observed that students with severe health issues often have unusual variations across their scores.

As a result of the academic achievement evaluation, Mr. Portnoy recommended that Student have additional "Tier 2" support for reading beyond the regular education program. For math, he recommended that additional support be provided by a special education resource teacher. He suggested that Student may need more time to complete tests and homework, modified homework, that she be given tests and quizzes in smaller classrooms with less distraction, and that she be allowed to use a calculator. (Exhibit 21.)

**Jessica Garrett (Tr., pp 256-296)**: Dr. Garrett, a clinical psychologist, is the Director of Psychological Assessment at the Birmingham Maple Clinic. She conducted an IEE of Student, which included an academic assessment and a cognitive assessment. She drafted a report that was admitted into evidence as Exhibit 2. Dr. Garrett found that Student's scores were "pretty low across the board with a particular weakness in processing speed." Although Student's scores were low, she did not function at a cognitively impaired range because she does not have adaptive behavior impairment. In other words, the difference between Student's extremely low cognitive scores and average adaptive skills means that she would not fit the cognitively impaired criteria for eligibility.

When asked about the academic evaluation done by the school, Dr. Garrett testified that the results would have caused her to want to do follow up testing to look for a learning disability or some other reason for the low achievement scores. She also explained that doing a cognitive test to establish a baseline for Student would be important to detect any kind of loss of cognitive skills going forward based on Student's

21-007624
Page 10

complex medical history. She would repeat the cognitive testing every three years to see if there is an upwards or downwards trend.

Dr. Garrett testified that Student's academic scores were generally "commensurate with" her cognitive scores, but that she would be capable of learning and achieving higher scores in reading, math, and writing with "intensive, individualized support." When asked whether the five hours of additional time in the resource program set forth in the December 2021 IEP would be sufficient, Dr. Garrett opined, "It would depend on what those five hours looked like, but probably not." Dr. Garrett then suggested some classroom interventions or accommodations that would help Student, including teaching her in as small of a group as possible, not expecting her to work at grade level, shortened assignments, a resource room teacher that could be with her to explain things, and breaks because she gets fatigued easily. While acknowledging that Student's December 2021 IEP included a teacher consultant—like what Dr. Garrett would recommend—she thought the explanation in the IEP could be clearer and more detailed than it was. In sum, Dr. Garrett opined that the accommodations in Student's IEP would not be sufficient for her to make progress.

With respect to the goals set forth in the IEP, Dr. Garrett opined that doing math at a 4th grade level would not be manageable for Student and that the reading goal was not appropriate. Dr. Garrett did not have an opinion on the transition goal because she is not familiar with the abilities necessary to do cosmetology. She opined that the socio-emotional/behavioral goal was appropriate. Dr. Garrett then opined that Student could not meet the writing goal without "intensive" support. Finally, she surmised that some forms of assistive technology, such as audio books, speech to text software, or Dragon Dictation may have been helpful to Student.

On cross-examination, Dr. Garrett testified that she did not do any classroom observations of Student and that she did not speak to anyone at the school district. She only reviewed the December 2021 IEP and the academic testing. She testified that she was surprised that the Woodcock-Johnson IV academic scores for Student from the school's testing was "much higher" than the Weschler academic scores from the IEE. She agreed, however, that the variation from one test to the other might be attributed to Student's level of fatigue.

## FINDINGS OF FACT

Based on the evidence presented at the hearing, including the exhibits and the sworn testimony of the witnesses, the following facts were established:

1. Petitioner S.C. is the mother of Student.

21-007624
Page 11

2.  In the 2021-2022 School Year, Student was a senior at East English Village Preparatory Academy (a public high school run by Respondent) set to graduate on June 16, 2022 (Tr., p 215).

3.  Student was eligible for special education services with an Other Health Impairment (OHI) based on her Sickle Cell Amenia. Student has also been diagnosed with Attention-Deficit/Hyperactivity Disorder (ADHD). (Exhibit B.)

4.  Hospitalizations from Student's illness caused her to miss approximately one week of every month of school during the 2021-2022 School Year. Student had assignments sent to her at the hospital, but it was more difficult for her to keep up with her work at the hospital (Tr., pp 205, 219).

5.  Student wishes to study cosmetology and would like to someday own her own salon. She has been braiding hair since she was six years old, learning new styles from watching YouTube videos. She explained that she likes cosmetology because it is artistic and because she is a hands-on learner. (Tr., pp 204-210.)

6.  After graduation, Student planned to attend a two-year community college for business and to continue pursuing cosmetology (Tr., p 215).

7.  Student had a 2.6 grade point average as of September 1, 2021 (Exhibit 2). Most of her grades in high school were C's and B's, with some D's and A's as well (Exhibit Y).

8.  The IEP in place of Student at the beginning of the 2019-2020 School Year was an Annual IEP dated February 13, 2019. This IEP was amended on February 15, 2019. Accommodations called for in the February 2019 IEP included allowing assignments to be completed in the resource room (small group setting), extended time to complete assignments, modified assignments, and use of a calculator in math. (Exhibits A & B.)

9.  The Brigance Comprehensive Inventory of Basis Skills test administered to Student on February 5, 2020, showed Student at a 7th grade level for "Comprehensive Reading Passage," a 2nd grade level for "Math Computational Skills," and an 8th grade level for "Word Recognition" (Exhibit F).

10. A Review of Existing Evaluation Data (REED) meeting for Student was held on February 11, 2020, in preparation for an IEP team meeting. The REED team considered the need for further evaluations of Student but did not select the option because documentation of Student's medical condition continued to qualify her for special education services under the OHI category. Both Student and Petitioner were present for the REED meeting. (Exhibit F.)

21-007624
Page 12

11. Later, on the same day as the REED meeting, the IEP team met to discuss revising Student's IEP. Student, Petitioner, and her attorney were all present at the IEP meeting (Tr., pp 116-117). Accommodations called for in the February 2020 IEP included extended time of one day on assignments for English Language Arts (ELA), extended time of one day for math, 30 extra minutes for quizzes and tests to be completed in the resource room with reduced questions, one additional day for final exams. (Exhibit D.)

12. On February 25, 2020, after reviewing the February IEP, Petitioner sent an email to Tammora Green (Respondent's Supervisor of Compliance) to express some concerns she had about the IEP. In Petitioner's view, the extended time modification in the IEP should have provided for more extended time. Petitioner also asserted that the IEP itself should have expressly addressed the subject of parent/teacher communication to ensure that Petitioner was made aware of any failing grades in a timely manner (Exhibit 8).

13. Student spent her entire junior year (2020-2021 School Year) remote learning because of the COVID-19 pandemic.

14. Respondent assigned a special education teacher to be a case manager for Student. Beginning with the 2020-2021 School Year, and continuing into the following school year, that teacher was Gretchen Madison. In her role as Student's case manager, Ms. Madison would both "push in" to Student's math and ELA classes (to help with anything Student felt she did not understand) and "pull out" Student from class to work with her separately and provide extra services. (Tr, pp 357-359, 430.)

15. Ms. Madison was responsible for preparing the progress reports associated with Student's IEP meetings. For each IEP goal, she would select an option from a drop-down menu, such as "progressing as expected" or "limited/no progress" and then add a brief comment. For most of Student's goals, Ms. Madison selected "progressing as expected." It was Ms. Madison's understanding that the underlying data was not supposed to be shown on the progress report itself. In addition to the formal progress reports, Ms. Madison kept an online logbook to track her daily interactions with Student. She relied, at least in part, on Student's classwork and grades to determine whether Student was "progressing as expected." Thus, for certain goals, Student's progress was "doing grade level work." (Tr., pp 364, 377, 398, 427, 429-435, 437-438; Exhibit 22; Exhibit 25; Exhibit X.)

21-007624
Page 13

16. On October 1, 2020, Petitioner sent an email to Marlene Hunter-Armstrong and Tammora Green asking to have a meeting with the IEP to put a communication plan in place that would allow her to monitor Student's progress (Exhibit 15).

17. On October 16, 2020, in response to Ms. Green's offer to set up a meeting between the IEP team and Petitioner, Petitioner sent another email to Ms. Green asserting that none of Student's test scores or IEP data had been shared with her and that she wished to add a writing goal to the IEP. Ms. Green responded that Petitioner's concerns would be addressed at the meeting with the IEP team. (Exhibit 17.)

18. Petitioner met with the IEP on October 20, 2020, to discuss her concerns about communication, testing, data, and goals.

19. On October 26, 2020, Petitioner again sent an email to Ms. Green asking for "all decision making data." On October 28, 2020, Ms. Green responded to Petitioner attaching the data collected to support the extended time decision in the February 2020 IEP. (Exhibit 19.)

20. A REED meeting for Student was held on October 30, 2020. Petitioner and Student both attended the meeting. The purpose of the meeting was to review existing data and to consider what other information would be needed to determine appropriate programs or services for Student. In the REED meeting it was determined that Respondent should conduct an academic achievement assessment of Student to get an update measure of Student's academic achievement and development needs and to determine whether any additions or modifications to her IEP would be appropriate. (Exhibit G.)

21. Petitioner requested and agreed with the decision to administer academic achievement testing to Student. Petitioner's primary concern was about whether Student was learning the material she would need to be successful after high school. Accordingly, she wanted the achievement evaluation to cover math, reading and writing. Petitioner did not have any concerns about Student's cognitive abilities. Likewise, Respondent did not see a need to do a cognitive evaluation because it was clear that Student would continue to be eligible for special education services under the OHI category (Tr, pp 147-149, 159-160, 243-245, 423, 458; Exhibit C.)

22. As requested by Petitioner, Steven Portnoy, a school psychologist employed by Respondent, administered the Woodcock-Johnson IV achievement test to Student on November 13, 2020. Student scored as follows on the various categories of the test: Basic Reading Skills 98 (Average), Reading Comprehension 90 (Average), Reading Fluency 83 (Low Average), Math

Calculation Skills 60 (Impaired), Math Reasoning 78 (Borderline), Written Expression 83 (Low Average). (Exhibit 21).

23. Given Student's low math scores, Mr. Portnoy recommend that her IEP include such accommodations as additional time on tests & homework, modification of assignments, tests & quizzes in a separate classroom without distractions, and use of a calculator (Exhibit 21).

24. An IEP team meeting was held on December 2, 2020. Student and Petitioner were both present. For the December 2, 2020, IEP meeting, Respondent and Petitioner had access to Mr. Portnoy's academic achievement evaluation with the Woodcock-Johnson IV test scores. Accommodations called for in the December 2020 IEP included extended time of two additional weeks make up assignments missed due to Student's intermittent hospitalizations, reduction in assignments by 10%, completion of assignments with resource support teacher, one extra day to complete all work, extended time (time and a half) for all academic subjects, and use of a calculator for math and science. (Exhibit C.)

25. Another IEP team meeting was held on January 21, 2021, for an annual review. Student and Petitioner were both present. The IEP team kept the same accommodations in place from the previous IEP. (Exhibit E.)

26. Student's February 2020 and December 2020 IEPs called for Student to receive 300 minutes special education resource programming. This was increased to 600 minutes in her January 2021 IEP. (Exhibits C, D, & E.)

27. Over Student's time in high school, the IEP teams adjusted some of Student's IEP goals while leaving others largely unchanged. For instance, Student's Speech and Language goals remained largely consistent with only one change between the February 2020 and December 2020 IEPs. Student's math goals, on the other hand, became gradually less ambitious. Her February 2020 math goals (involving linear and multi-step equations) was more advanced than her December 2020 math goals (algebraic problems), which in turn was more advanced than her January 2021 math goals (addition, subtraction, and multiplication). A writing goal, absent in her February 2020 IEP, was added to her December 2020 and January 2021 IEPs. The reading goal in Student's February 2020 IEP focused on comprehension while the reading goal in her January 2021 focused instead on fluency. (Exhibits C, D, and E.)

28. Respondent contracted with a tutor for Student from December 2020 through June 2021 to provide compensatory education services in the subjects of math, reading, and writing. The tutor, Darya Owens, had been a teacher for 28 or 29 years and had over twenty years of experience working with students like

21-007624
Page 15

Student on a one-to-one basis. Ms. Owens worked with Student for four hours each weekday, Monday through Friday, for a total of twenty hours of one-on-one instruction per week. When Ms. Owens was done working with Student in June of 2021, she did not feel like Student had made any progress. Student's reading level may have "increased a little bit," but her math skills did not change. (Tr., pp 17-18, 23, 26, 29-30).

29. Student met with Dr. Jessica Garrett of the Birmingham Maple Clinic on September 1, 2021, for a psychological examination. Dr. Garrett administered multiple tests during the four-hour session. For cognitive testing, Student took the Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV) and received a Full Scale IQ score of 68, which Dr. Garrett described as "Extremely Low." For academic testing, Student took the Wechsler Individual Achievement Test, Third Edition (WIAT-III) and received a Standard Score for Total Achievement of 58, which Dr. Garrett described as "Extremely Low." (Exhibit 2.)

30. Across all categories, Student's WAIS-IV achievement scores were significantly lower than her test results using the Woodcock-Johnson IV test administered by Mr. Portnoy. The variation could be attributable to Student's lethargy or fatigue that Dr. Garrett noted when Student was taking the WAIS-IV test. (Exhibit 2; Tr., pp 274, 291-292.)

31. Student tested with an Adaptive Behavior Score of 100, which Dr. Garrett described as "Adequate." Adaptive behavior means "self-care skills" (Tr., pp 267-268; Exhibit 2).

32. Based on Dr. Garrett's testing, Student's biggest weakness was in processing speed, meaning her ability to process information quickly, and her greatest strength, relatively speaking, was in verbal comprehension (Tr., p 265).

33. Dr. Garrett concluded that Student's achievement scores were commensurate with her cognitive scores and that Student did not fit the profile of a student with Cognitive Impairment or a student with a Specific Learning Disability. She further concluded that Other Health Impairment "likely continues to be the most accurate when it comes to her special education certification." (Exhibit 2.)

## CONCLUSIONS OF LAW

A. Burden of Proof

Petitioner, as the party challenging Respondent's determination, has the burden of proving by a preponderance of the evidence all claims raised in this matter. *Schaffer v Weast*, 546 US 49; 126 S Ct 528; 163 L Ed 2d 387 (2005); *Doe v Defendant I,* 898 F2d 1186 (CA 6, 1990). Proof by a preponderance of the evidence "requires that the fact

21-007624
Page 16

finder believe that the evidence supporting the existence of the contested fact outweighs the evidence supporting its nonexistence." *Blue Cross and Blue Shield of Michigan v Milliken*, 422 Mich 1; 367 NW2d 1 (1985).

   B.   Alleged Failure to Evaluate Student

Petitioner first asserts that Respondent failed to conduct the evaluations necessary to determine why Student was not making educational progress appropriate to her circumstances. As an initial matter, given the facts that (1) Student tested with a full scale IQ of 68 (in the "extremely low" range), (2) missed significant schooling time due to hospitalizations caused by her Sickle Cell Anemia, (3) did her entire 11th grade year of schooling virtually because of the COVID-19 pandemic, and (4) still graduated on time with passing grades, Petitioner's conclusion that Student was not making educational progress appropriate to her circumstances is not supported by the record. That aside, Petitioner's argument that Respondent's failure to conduct an additional evaluation amounted to a denial of a FAPE to Student falls short for other reasons.

Before filing her due process claim, Petitioner did not have any concerns about Student's cognitive abilities and did not request that Respondent conduct a cognitive evaluation of Student. Rather, Petitioner's concern was about whether Student was learning the material in math, reading, and writing. That is why she requested only academic achievement testing. Likewise, Respondent did not believe cognitive testing would be necessary because Student was clearly eligible for special education services under the OHI category. Nevertheless, Petitioner now asserts that Respondent should have asked Petitioner, in 2020, to consent to Student receiving a full psychological evaluation like the evaluation Dr. Garrett eventually conducted on September 1, 2021.

Petitioner has not met her burden of proving that such an evaluation would have provided any additional, meaningful insight into Student's educational needs. Mr. Portnoy testified that cognitive testing may provide evidence of a learning disability, depending on the score. Beyond Mr. Portnoy's comment, however, Petitioner has presented no argument or evidence showing how cognitive testing may have been indicative of a learning disability. Presumably, low achievement scores coupled with higher cognitive scores would be indicative of some specific learning disability. But when cognitive testing was finally done by Dr. Garrett, the results were shown to be "commensurate" with Student's achievement test scores and, thus, not indicative of any specific learning disability. Dr. Garrett's conclusion was consistent with Respondent's conclusion that Student does not qualify for services as Cognitively Impaired or with a Specific Learning Disability, and that she should continue to receive special education services under the OHI eligibility category. Thus, there is no reason to conclude that a full psychological evaluation of Student in 2020 would have merited any different approach to her eligibility or the services provided.

21-007624
Page 17

Given Student's medical condition, Dr. Garrett testified that, "in a perfect world," a baseline measure of her cognitive ability would be good to have because, if rechecked every three years, it would reveal any upward or downward trends in cognitive ability associated with Student's Sickle Cell Anemia. Petitioner does not explain how this knowledge would have informed the manner in which Respondent provided special education services to Student. To the extent Petitioner has argued that Respondent violated the IDEA by not conducting initial cognitive testing in 2008 (to establish a baseline), the issue is outside the scope of the present proceeding, which is necessarily limited to Respondent's actions taken after July 19, 2019, when Petitioner's previous due process claim against Respondent was resolved through settlement.

Petitioner has also suggested that Respondent should have pushed for additional testing because the IEE revealed a "significant discrepancy between [Student's] achievement and cognitive scores when compared to her adaptive skills scores." It is not made clear in Petitioner's argument, however, why a discrepancy between achievement (academic success) and adaptive skills (self-care) is relevant to the kind of special education services to be provided to Student. Dr. Garrett testified only that the discrepancy was relevant because it precluded Student from being eligible under the Cognitively Impaired category.

Based on Dr. Garrett's comment at the hearing that some forms of assistive technology "perhaps" would have helped Student (Tr., p 286), Petitioner argued that an additional evaluation would have prompted Respondent to include these items among the services provided to Student. But Petitioner does not explain how or why a cognitive evaluation, as opposed to the achievement evaluation that Respondent did conduct, would shed any additional light on the benefits of assistive technology. Moreover, it is not clear that Dr. Garrett's own testimony about assistive technology was rooted in her evaluation of Student. Rather, her formal report recommended only "[c]ontinued intensive special education services." (Exhibit 2.)

With respect to the question of "intensive support," which Dr. Garrett recommended, Petitioner did not establish how "intensive support" would be different than what Respondent was already providing for Student. When Gretchen Madison was asked at the hearing whether she provided any "intensive services" to Student, she answered that she did not know what Petitioner's attorney meant by "intensive services." Petitioner's attorney then candidly admitted that she also was not sure exactly what the term meant. (Tr., p 361.) Later, when Dr. Garrett was asked at the hearing whether the 300 minutes per week would be sufficient to meet the kind of "intensive support" she prescribed, she answered only, "It would depend on what those five hours looked like, but probably not." (Tr., p 285.) This kind of uncertain, speculative testimony from an independent evaluator who spend only four hours with Student on one day in September 2021, does not provide a valid basis to second-guess the recommendations

21-007624
Page 18

and decisions made by Respondent's professional staff, who had worked with Student on a daily basis for years.

In sum, the evidence presented at the hearing does not support Petitioner's conclusion that Student's needs merited re-evaluation or that any additional testing of Student would have somehow more usefully informed Respondent's provision of FAPE to Student. See 34 CFR § 300.303(a)(1).

C. Alleged Failure to Draft an Appropriate IEPs

Petitioner next contends that Student's IEPs were not appropriately drafted. In support of this position, Petitioner relies on the allegedly "haphazard" assortment of goals that Respondent set for Student. In making this argument, Petitioner suggests that Student's goals were both too low and too high, asserting that goals only providing for *de minimis* progress from year to year are insufficient and that goals should be modified to allow a student to make progress when they are not achievable as written. The record shows, however, that Student's goals were modified in a manner consistent with Student's progress or lack thereof. Student struggled in math more than in any other subject. Accordingly, Respondent made Student's math goals progressively less ambitious each year, moving from linear equations in the February 2020 IEP to addition, subtraction, and multiplication in the January 2021 IEP. Respondent also added a writing goal to the December 2020 IEP after a request from Petitioner.

Petitioner objects to Respondent allegedly imposing an "arbitrary limit" of four goals per IEP (Tr., pp 42-43). The record shows, to the contrary, that Student had significantly more than four goals in each of her IEPs and that Respondent willingly added a writing goal to the December 2020 IEP at Petitioner's request.

Curiously, Petitioner also argues that Student's passing grades do not evidence progress, because Student did not truly "earn" her grades but was only able to pass because Respondent relied on push-in supports and reductions in assignments. Push-in supports and reductions in assignments were some of the special education services and accommodations that were designed for Student in her IEPs. The fact that these services and accommodations may have helped Student to succeed in school is evidence that Student's IEPs were appropriate—not that her IEPs were defective.

Petitioner also argues that Respondent could not have drafted appropriate IEPs for Student because Respondent's staff denied Petitioner a meaningful participatory role on the IEP team, failed to communicate with Petitioner, and failed to provide requested data.[3] The record shows that Petitioner was an active participant in Respondent's

---

[3] Although Petitioner alleged in her due process complaint that she did not receive certain data requested from Respondent (Complaint, ¶¶ 58b, 63a), she did not expressly allege that the denial of the requested data was, in and of itself, a violation of the IDEA or that the denial of data amounted to a denial of a

21-007624
Page 19

process of providing special education services to Student. Petitioner was present at every IEP meeting and her concerns were addressed in the IEPs. On at least one occasion her attorney was also present. Although Petitioner has asserted otherwise, the record shows that Respondent added a writing goal to the IEP at Petitioner's request. Petitioner also exchanged emails with Tammora Green and other members of Respondent's special education staff about the services being provided to Student.

In response to Petitioner's expressed concerns, Ms. Green arranged for a meeting between Petitioner and the IEP team on October 20, 2020, to address Petitioner's concerns. This meeting ultimately led to the REED meeting of October 30, 2020, and the subsequent achievement testing administered by Mr. Portnoy. The achievement testing done by Mr. Portnoy was conducted at the request of Petitioner to address her concern that she did not have enough information about Student's academic achievement in math, reading, or writing. Additionally, shortly after the October 20, 2020, meeting, Ms. Green sent Petitioner an email attaching the data collected to support the extended time decision in the February 2020 IEP. (Exhibit 19).

In sum, Petitioner has not met her burden of proving that Student's IEP team failed to draft appropriate IEPs.

### D.   Alleged Failure to Review and Revise IEPs

Petitioner also asserts that Respondent failed to review and revise Student's IEPs as necessary and required. In support of this contention, she relies on (1) progress notes allegedly submitted by Darya Owens to Respondent and (2) the recommendations in Mr. Portnoy's November 13, 2020, academic evaluation of Student.

Ms. Owens' progress notes cannot support a claim that Respondent was obligated to revise Student's IEP. While Ms. Owens testified that she provided progress notes to Respondent, the progress notes themselves were not offered into evidence. Petitioner cannot meet her burden of proving that Respondent was obligated to review and revise Student's IEPs based on material that has not been offered into evidence.

With respect to Mr. Portnoy's recommendations, most if not all of them, were in fact incorporated into Student's IEPs. His evaluation recommended math support provided by a special education resource teacher, additional time on tests and classwork, modified homework and assignments, and use of a calculator (Exhibit 21). All of these services and accommodations were included in Student's December 2020 IEP and her January 2021 IEP (Exhibits C & E).

---

FAPE. Moreover, when the issues were clarified at the April 29, 2021, prehearing conference pursuant to Mich Admin Code, R 340.1725e(1)(d)(i) and Mich Admin Code, R 792.11802(b)(i), Petitioner did not identify Respondent's alleged failure to adequately share data as one of the bases for the asserted denial of FAPE.

21-007624
Page 20

Thus, the record does not support a conclusion that additional revision of Student's IEPs was required under 34 CFR § 300.324(b).

E. Alleged Failure to Implement IEPs

Finally, Petitioner argues that the testimony of Darya Owens about Student's academic abilities shows that Respondent did not implement Student's IEPs as written. In Ms. Owens's view, Student's skills were not as advanced as indicated on Student's IEPs and by Mr. Portnoy's Woodcock-Johnson IV academic achievement evaluation. Petitioner has not shown by a preponderance of the evidence that Darya Owens's estimation of Student's abilities, based on her experience in tutoring Student after school, were a more reliable and accurate indicator than Student's performance on the academic achievement evaluation administered by Mr. Portnoy. Accordingly, Ms. Owens's opinion of Student's abilities does not establish that Respondent failed to implement Student's IEPs. Additionally, both Gretchen Madison and Genise Turner testified credibly that they worked daily with Student implementing her IEP. Petitioner has not established otherwise.

F. No Denial of FAPE

For the reasons stated above in Subparts B through E, Petitioner has failed to establish by a preponderance of the evidence that Respondent did not offer Student IEPs "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F, supra*, 137 S Ct at 999.

G. Issues Outside the Scope of the Complaint and Order Following Prehearing Conference

In her brief submitted after the hearing, Petitioner made certain arguments about issues outside the scope of her complaint as clarified and identified as issues in dispute throughout the proceedings leading up to the due process hearing. These include assertions that Respondent did not adequately train its staff and that Respondent did not provide transportation to Student as promised. Because these issues were not identified in advance as questions to be addressed and resolved at the due process hearing, it would not be appropriate to address them now.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** Petitioner's complaint is dismissed.

**IT IS FURTHER ORDERED** that any claims or defenses not specifically addressed herein are dismissed with prejudice.

**21-007624**
**Page 21**

A party aggrieved by this decision may seek judicial review by filing an action in a court of competent jurisdiction within 90 days of the date of this order.

_____
**Paul Smith**
**Administrative Law Judge**

**21-007624**
**Page 22**

## PROOF OF SERVICE

I certify that I served a copy of the foregoing document upon all parties and/or attorneys, to their last-known addresses in the manner specified below, this 13th day of January 2023.

*Verna Curtis*
_____
**Verna Curtis**
**Michigan Office of Administrative**
**Hearings and Rules**

### Via Electronic Mail



Elizabeth K. Abdnour
Elizabeth Abdnour Law
1100 W. Saginaw Street, Suite 4A-2
Lansing, MI 48915
**elizabeth@abdnour.com**

Jacquelyn Babinski
Elizabeth Abdnour Law
1100 W. Saginaw Street, Suite 4A-2
Lansing, MI 48915
**jacquelyn.babinski@abdnour.com**

Detroit Public Schools Community District
Lohren Nzoma, Special Education Contact
3011 West Grand Boulevard, Suite 1400
Detroit MI 48202
**Lohren.Nzoma@detroitk12.org**

Marquita Sylvia
Office of the General Counsel
3011 W. Grand Boulevard, Suite 1002
Fisher Building, 10th Floor
Detroit, MI 48202
**marquita.sylvia@detroitk12.org**

Erin Walz
Thrun Law Firm, P.C.
P.O. Box 2575
East Lansing, MI 48826-2575
**ewalz@thrunlaw.com**

Michele R. Eaddy
Thrun Law Firm, P.C.
P.O. Box 2575
East Lansing, MI 48826-2575
**meaddy@thrunlaw.com**

Bethanie Eggleston
Michigan Department of Education
P.O. Box 30008
Lansing, MI 48933
**EgglestonB1@michigan.gov**

Precious Boone
MDE Office of Administrative Law
P.O. Box 30008
Lansing, MI 48909
**MDE-AdminLaw@michigan.gov**

**21-007624**
**Page 23**